## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| HOMER JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-00907-TWP-DLP |
| | ) | |
| CITY OF INDIANAPOLIS, | ) | |
| KOLIN KINDER, Officer, | ) | |
| JESSICA FORSYTH, and | ) | |
| RICHARD REEVES, Officer, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed by Defendants the City of Indianapolis ("the City"), and Indianapolis Metropolitan Police Department ("IMPD") officers Kolin Kinder, Jessica Forsyth, and Richard Reeves, (collectively "the Officers"), (the Officers and the City, collectively, "Defendants") (Filing No. 57).  Plaintiff Homer Johnson's ("Johnson") Amended Complaint alleges: (1) a Fourth and Fourteenth Amendments excessive force claim against the Officers pursuant to 42 U.S.C. § 1983; (2) a *Monell* claim against the City; and (3) a state law claim against all Defendants for equitable relief pursuant to Article 1, § 11 of the Indiana Constitution (Filing No. 43).  For the reasons set forth below, the Defendants' Motion for Summary Judgment is **granted**.

## I.        FACTUAL BACKGROUND

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Johnson as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A.      __IMPD's Use of Force Policies__

IMPD's General Order 1.30, titled "Use of Force – Principles," (the "Use of Force Policy") "provides [IMPD] officers with guidelines for the reasonable use of force." ([Filing No. 58-12 at 4-5](#).)  The Use of Force Policy "authorizes reasonable force to accomplish lawful objectives," and provides that "[o]fficers may use reasonable force if the officer reasonably believes the force is necessary given the totality of the circumstances."  *Id*. at 5.  Pursuant to the Use of Force Policy, "[m]edical assistance shall be obtained as soon as practical for any person who, as a result of an officer's use of force, has sustained visible injury or serious bodily injury, or who has expressed a complaint of injury or continuing pain."  *Id*.

IMPD's General Order 1.31 governs the investigation and reporting procedure regarding use of force incidents.  *Id*.  General Order 1.31 requires officers to notify a supervisor, as soon as practical, if a use of force resulted in or was alleged to cause serious bodily injury, injury, or a complaint of pain.  *Id*. at 5-7.  General Order 1.31 also requires officers to document all uses of force that exceed un-resisted handcuffing.  *Id*. at 7.  If an officer's use of force exceeds unresisted handcuffing, General Order 1.31 requires a supervisor to conduct a preliminary investigation.  *Id*. at 8.  The supervisor must document any relevant evidence during their investigation and attempt to interview the involved officer(s), suspect(s), and witnesses.  *Id*.  Supervisors are also required to provide a disposition of whether the involved officer(s) complied with IMPD's policies.  *Id*.  The supervisor is required to enter comments regarding the results of their investigation, reason for their disposition, and whether they recommended further action be taken.  *Id*.

General Order 1.31, requires that IMPD maintains records for all use of force incidents that led to or allegedly caused serious bodily injury, injury, or complaint of pain.  *Id*. at 9. Records

regarding use of force incidents are maintained by the Performance and Policy Division. *Id*. An trends that could indicate training needs, equipment upgrades, or policy modifications. *Id*.

IMPD Sergeant Stephen Griffith ("Sgt. Griffith") works with the Commission for the Accreditation of Law Enforcement Agencies ("CALEA") to ensure that IMPD's directives meet and exceed national standards for best practices in law enforcement. *Id*. at 1.   His duties include generating data reports and on demand reports about department discipline and trends, and deficiencies in IMPD's policies or practices that led to serious bodily injury from excessive force.  *Id*. at 16.  Between 2014 and 2019, out of nearly 7,000 uses of force documented by IMPD, there were eleven incidents where IMPD determined that officers used unreasonable force of which four involved use of a taser, two involved the use of a firearm being discharged at a moving vehicle, and five involved the use of unreasonable physical force on a suspect.  *Id*. at 16- 17.   In all incidents but one, the officer who used unreasonable force was disciplined for not complying with IMPD's General Orders.  *Id*.  Discipline was not imposed in the last circumstance because IMPD missed the 60-day deadline.  *Id*.

**B.     IMPD's Bias-Free Policing Policy**

General Order 1.2 governs IMPD's policy against bias-based profiling and discrimination *Id*. at 10.  The policy identifies biased policing as "[t]he inappropriate consideration of specified characteristics in carrying out duties."  *Id*.  Specific characteristics are defined to include "[r]ace, national origin, citizenship, religion, ethnicity, age, gender, disability, socioeconomic status, gender identity, or sexual orientation in relation to making law enforcement decisions."  *Id*.  IMPD officers may only consider the specified characteristics "when credible, timely intelligence relevant to the locality link the person or people with a specified characteristic to a specific unlawful incident, scheme, or criminal pattern."  *Id*. The policy requires officers to complete

annual training in "bias-free policing, including the legal and psychological aspects of it and the content of this policy," and all supervisors are responsible for ensuring that officers are familiar with this policy. *Id*. at 10; 39. Complaints of alleged biased policing must be investigated, and those found to be in violation of the policy are subject to discipline. *Id*. at 11. All complaints, including disposition record are maintained in accordance with General Order 3.16, and the Internal Affairs section prepares an annual summary report to be disseminated to the Chief of Police, the Deputy Chief of the Performance and Policy Division, and to all division commanders. *Id*. at 10-11.

**C.     IMPD's Training Policies**

Recruit officers are required to complete six months of training at IMPD's Training Academy (the "Academy") where they learn about IMPD's directives, receive approximately 60 hours of descalation training, receive approximately 60 hours of training on search and seizure, complete hundreds of hours of training regarding the use of force, and complete an 8-hour course called "fair and impartial policing". (Filing No. 58-11 at 2.) Recruit officers are also required to participate in Blue Team—use of force reporting program—training where they learn about general orders governing the use of force, appropriate uses of force, and proper application of IMPD-approved force techniques and bias-free policing. *Id*. at 3. After graduating from the Academy, the officers are then placed on a one-year probation period and required to complete the IMPD Field Training Officer program where veteran officers assist the probationary officers apply the lessons learned at the Academy. *Id*. Upon completing field training, the probationary officer's records are reviewed by district commanders and the Director of Training to provide the Chief of Police with a recommendation on whether to retain or terminate the officer. *Id*. at 4. Once retained as an officer, IMPD requires that they complete, at minimum, sixteen hours of in-service training

on the use of firearms and force each year. *Id*. Here, Defendants' records show—and Johnson does not dispute—that the three Officers were current with all IMPD and state-required training. *Id*. at 4, 7-45.

**D.     The August 9, 2019 Incident**

On August 9, 2019, Johnson (a Black man in his 60's) attended a family barbeque for 4 or 5 hours during which he drank one beer. (Filing No. 66-1 at 4).  After the barbeque, his son drove him to ex-wife's house as he would sleep in her garage a couple of times per month. *Id*. at 3. He fell asleep on the couch inside the garage. *Id*. at 5.  Johnson's ex-wife reported a burglary in progress at her residence and the Officers responded to the scene around midnight where they observed the garage entry door ajar, a lock broken or damaged, and an individual asleep inside who they later identified as Johnson (Filing No. 58-4 at 9-14; Filing No. 66-1 at 5; Filing No. 66-2 at 6-10).  The Officers report they announced themselves multiple times without any response and, once in the garage, they observed Johnson face down on the ground asleep with his arms under his waist, chest, and belly area (Filing No. 58-6 at 11; Filing No. 66-3 at 5; Filing No. 66-4 at 3).

Johnson, who is a heavy sleeper, never heard the Officers make any announcements that they were law enforcement officers. (Filing No. 66-1 at 8).  Johnson's first memory is "… I was being held and pushed and I was in one spot and I ended up all of the way on the other side of my garage." (Filing No. 66-1 at 7-8).  He was in fear of his life because he "didn't know who or what was going on so he just kept screaming and screaming." *Id*.  The Officers threw Johnson on the floor from the couch, held him down by applying pressure to his neck and legs, and later handcuffed him (Filing No. 43 ¶ 18; Filing No. 66-1 at 1-8).  Johnson woke up startled as he was being handcuffed and continued "hollering at the top of my lungs" as he believed he was being

robbed because "not once did they say we are from the police department, IMPD". (Filing No. 66-1 at 5). After being handcuffed for no more than ten minutes, the Officers confirmed Johnson's identity, removed the handcuffs, did not charge him with a crime, and left the scene (Filing No. 66-4 at 6; Filing No. 66-3 at 6). Johnson "could not really move and his face was bleeding." (Filing No. 66-1 at 7. ) The Officers never offered Johnson medical assistance after the incident. *Id*. at 6.

**E.     Johnson's Hospital Visits**

Once the Officers left, Johnson's son took him to Methodist Hospital Emergency Room where he was diagnosed with having head pain (Filing No. 66-6 at 4). Two days later, on August 12, 2019, Johnson received care at the Eskenazi Emergency Department where he reported continued pain and was diagnosed with a concussion without "loss of consciousness, headache, pain in right forearm, and pain in right elbow." *Id*. at 6. On August 19, 2019, Johnson's physician, Dr. Aloysius Humbert, at Eskenazi Emergency Department reported that his x-ray "did not reveal any fracture but did show an effusion," and "[Johnson] is in a sling for comfort complaint of continued pain." *Id*. at 12.

**F.     IMPD's Investigation**

While at Methodist Hospital Emergency Room, Johnson's son alerted IMPD to the fact that his father was beaten by the police (Filing No. 66-7 at 3). An IMPD supervisor, Sergeant Steve Rivers, responded to the hospital and, upon arrival, opined that Johnson was visibly intoxicated based on "his demeanor, his disheveled clothing, [and] the strong odor of an alcoholic beverage…". (Filing No. 66-7 at 4.) After questioning Johnson and his son, Sergeant Rivers contacted IMPD's Special Investigations Unit ("SIU"), specifically Detective Arleatha Marble ("Detective Marble"), the SIU detective on duty, and advised her that "in my opinion, [Johnson]

was heavily intoxicated. And that's her call whether she responds to the scene or not" at the present time. *Id*. at 5.

Based on Sergeant Rivers' opinion, Detective Marble decided not to take Johnson's statement at that time but, over the course of her investigation, questioned and took statements from Johnson, his son, his ex-wife, and the three Officers (Filing No. 66-8 at 1-5). Detective Marble reports that "I could never get Johnson to give me a specific – he could never give me anything specifically [about] what occurred, what officer, if he was hit, kicked, pushed, shoved" but merely that the Officers roughed him up (Filing No. 58-8 at 21-24). Upon the completion of SIU's investigation, Detective Marble's captain, Joe Mason, found that Johnson's claims against the Officers were not credible. (Filing No. 66-8 at 4). Independently, the Marion County Prosecutor's Office did not pursue criminal charges against the Officers related to the August 9, 2019 incident. (Filing No. 59 at 10).

### G.   Johnson's Initial and Amended Complaints

On April 13, 2021, Johnson filed a three-count complaint alleging: (1) a Fourth and Fourteenth Amendments excessive force claim against *Unknown Officers 1-5*, pursuant to 42 U.S.C. § 1983; (2) a *Monell* claim against the City, IMPD, and Randal Taylor (in his official capacity as Chief of Police for the IMPD); and (3) a state law claim against all Defendants for equitable relief under Article 1, § 11 of the Indiana Constitution (Filing No. 1). As part of discovery, on May 27, 2021, the City's counsel emailed to Johnson's counsel the SIU report containing the names of the three Officers (Filing No. 58-10 at 1). On June 15, 2021, the parties filed a Stipulation of Partial Dismissal as to Certain Parties, requesting dismissal of defendants IMPD and Randal Taylor and, on June 16, 2021, the Court entered an order granting the motion for partial dismissal (Filing No. 13; Filing No. 14).

On December 7, 2021, Johnson filed an unopposed motion for leave to amend his Complaint to add the names of the Officers previously identified as *Unknown Officers 1-5* and to remove the previously dismissed parties (Filing No. 41).  On December 10, 2021, the Court granted his motion (Filing No. 41; Filing No. 42), and, that same day, Johnson filed his Amended Complaint with the names of the Officers (Filing No. 43).  The Defendants answered the Amended Complaint and, on April 15, 2022, filed the instant Motion for Summary Judgment concerning the two federal claims. (Filing No. 47; Filing No. 57). Johnson then filed a response and objection to Defendants' Motion for Summary Judgment, and the Defendants filed a reply reiterating the arguments from their summary judgment motion (Filing No. 65; Filing No. 67; Filing No. 71). Approximately four months later, on October 17, 2022, Johnson filed a Notice of Supplemental Authority (Filing No. 84), which the Court has considered.

## II.      SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Federal Rule of Civil Procedure 56(a).  The Court views the record in the light most favorable to the non-moving party, Johnson, and draws all reasonable inferences in his favor.  *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018).  However, inferences supported by only speculation or conjecture will not defeat a summary judgment motion . *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

"[T]he burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).   Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).  The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion.  *Grant v. Trustees of Indiana University*, 870 F.3d 562, 572-73 (7th Cir. 2017).

## III.   <u>DISCUSSION</u>

Defendants contend that summary judgment is appropriate as to the § 1983 claim against the Officers because they were not named in Johnson's initial Complaint and are therefore time barred. Defendants contend that Johnson's *Monell* claim against the City is baseless because the alleged constitutional deprivation was not caused by a governmental practice or custom, and Johnson failed to put forth any evidence showing a deliberate indifference by the City regarding its failure to train its officers on the use of force and bias-free policing or that the City's practice or custom was the but-for cause of his constitutional deprivation.  Lastly, the Defendants argue that the Court should not exercise supplemental jurisdiction over Johnson's state law claim for equitable relief against the Defendants pursuant to Article 1, § 11 of the Indiana Constitution.  The Court agrees with the Defendants on all points.

## A.   <u>Whether Johnson's Claim are Limited</u>

As a preliminary matter, Defendants argue that since Johnson did not file a Statement of Claims as required by the Case Management Plan, his claims are limited to those raised in his

Amended Complaint (Filing No. 59 at 20). Those claims include Count 1: Unconstitutional Use of Excessive Force (42 U.S.C. § 1983) (versus Officers Kinder, Forsyth and Reeves); Count 2: Violation of Indiana Constitution (versus All Defendants); and Count 3: *Monell* Violations of the U.S. Constitution (42 U.S.C. § 1983) (versus City of Indianapolis) (Filing No. 43 at 4-6). Johnson did not address this argument in his response and opposition to Defendants' Motion for Summary Judgment, and considering no prejudice results from his failure to file a Statement of Claim, the Court limits Johnson's claims against the Defendants to those alleged in his Amended Complaint. *See Von Duprin LLC v. Moran Elec. Serv., Inc.*, 2019 WL 535752, *7-8 (S.D. Ind. Feb. 11, 2019).

**B.**     **Whether Johnson's § 1983 Claim is Time Barred**

Indiana's two-year statute of limitations for personal injury actions applies to § 1983 claims. *See Arp v. Indiana State Police*, 2022 WL 3716526, *4 (S.D. Ind. Aug. 29, 2022) (citing *Behav. Inst. of Ind., LLC v. Hobart City of Common Council*, 406 F.3d 926 (7th Cir. 2005)). Accordingly, Johnson needed to sue the individual officers, at the latest, by August 9, 2021—two years after the encounter with the Officers (Filing No. 59 at 21). Defendants argue that because the Officers were not named in Johnson's initial Complaint filed April 13, 2021, and his Amended Complaint was filed December 10, 2021, after the statute of limitations expired, his Amended Complaint does not relate back pursuant to Rule15(c) and his § 1983 claim is barred (Filing No. 1; Filing No. 43; Filing No. 59). Johnson, however, argues his § 1983 claim against the Officers is timely because it relates back to his original Complaint pursuant to Rule 15(c) and Indiana Trial Rule 15(C) (Filing No. 67). Alternatively, if his Amended Complaint does not relate back under either Rule 15(c) or Indiana Trial Rule 15(C), Johnson argues the Court should exercise discretion to allow the § 1983 claim because the Defendants waived their ability to raise the relation back

argument by substantially participating in the case.  *Id*.  The Court disagrees with Johnson on all points.

### 1.    <u>Relation Back Pursuant to Fed. R. Civ. P. 15(c)</u>

Under Federal Rule of Civil Procedure 15(c)(1)(C), an amendment to a pleading that "changes the party or the naming of the party against whom a claim is asserted" relates back to the date of the original pleading so long as: (1) the amendment asserts a claim or defense arising out of the same conduct, transaction, or occurrence as the original complaint; (2) "within the period provided by Rule 4(m)," the party added by amendment "received such notice of the action that it will not be prejudiced in defending on the merits"; and (3) the added party "knew or should have known that the action would have been brought against it, *but for a mistake concerning the proper party's identity*."  Fed. R. Civ. P. 15(c)(1)(C) (emphasis added).  This issue here concerns the third point, specifically whether naming a "John Doe" defendant constitutes a mistake concerning the identity of the proper party so as to find that Johnson's § 1983 claim against the Officers in his Amended Complaint relates back to his timely filed original Complaint.

A recent Seventh Circuit decision is instructive on this issue.  *See Herrera v. Cleveland*, 8 F.4th 493 (7th Cir. 2021). *Herrera* involved an inmate who brought a § 1983 action against three unnamed correctional officers identified as "John Doe" until he could ascertain the proper identities of the officers. *Id*. at 494. Herrera later amended his complaint outside of the two-year limitations period to include the correctional officers' names.  *Id*. at 496.  The district court ruled that suing "John Doe" defendants constituted a "mistake" under Rule 15(c)(1)(C)(ii) and, as such, found that Herrera's amended complaint "related back." *Id*. However, the Seventh Circuit reversed the district court's decision.  *Id*. at 499.  The Seventh Circuit in *Herrera* reaffirmed its long adhered to "John Doe rule." *Id*.; *see, e.g., Gomez v. Randle*, 680 F.3d 859, 864 n.1 (7th Cir. 2012) (noting

that in a "John Doe" case, a "plaintiff's lack of knowledge about a defendant's identity is not a 'mistake' within the meaning of Federal Rule of Civil Procedure 15(c)"); *Worthington v. Wilson*, 8 F.3d 1253, 1257 (7th Cir. 1993) (explaining that a plaintiff's "lack of knowledge" as to the defendants' identities does not amount to "a mistake in their names"); *Wood v. Worachek*, 618 F.2d 1225, 1230 (7th Cir. 1980) (stating that Rule 15(c) "does not permit relation back where ... there is a lack of knowledge of the proper party".).

Johnson argues the Supreme Court in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 550 (2010) explicitly overruled this Circuit's "John Doe Rule" (Filing No. 67). However, the *Herrera* court addressed this misconception by stating "*Krupski* neither overruled nor undermined our circuit's treatment of the John Doe issue." *Herrera*, 8 F.4th at 499. *Krupski* concerned a plaintiff who mistakenly sued a subsidiary only to later realize that she meant to sue its parent corporation. *Krupski*, 560 U.S. at 543–44. In *Krupski,* the Supreme Court defined the term "mistake" as found in Rule 15(c)(1)(C)(ii) to mean:

> "[a]n error, misconception, or misunderstanding; an erroneous belief," *id*. (alteration in original) (quoting BLACK'S LAW DICTIONARY 1092 (9th ed. 2009)), and further described the word to include " 'a misunderstanding of the meaning or implication of something'; 'a wrong action or statement proceeding from faulty judgment, inadequate knowledge, or inattention'; 'an erroneous belief'; or 'a state of mind not in accordance with the facts.' " *Id*. (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1446 (2002)).

The *Krupski* court made clear that a plaintiff's deliberate choice to sue one party over another while "fully understanding factual and legal differences" between them is "the antithesis of making a mistake concerning the proper party's identity." *Krupski*, 560 U.S. at 549. The *Herrera* court in analyzing *Krupski* outlined three rationale for arriving at a different conclusion: (1) naming a defendant as "John Doe" in the complaint cannot be based on an error, misconception, misunderstanding, or erroneous belief; (2) a "John Doe" case and *Krupski* are different in kind

because the plaintiff in *Krupski* did not know what she did not know, while *Herrera* knew what he did not know; and (3) the definition of "mistake" under Rule 15(c)(1)(C)(ii) did not extend to a "John Doe" scenario and *Krupski* did not treat "inadequate knowledge"  and "mistake" as the same. *Herrera*, 8 F.4th at 498.

In Johnson's supplemental brief of authority, he contends that a recent Seventh Circuit case supports his position.  *See Rodriguez v. McCloughen*, --- F.4th ----, 2022 WL 4494294 (7th Cir. Sep. 28, 2022).  The Court is not persuaded.  *Rodriguez* involved a prisoner plaintiff who sought to amend his complaint to substitute named federal agents for defendants whom he previously identified by code "ATF UC 3749".  *Id*. at *1. The Seventh Circuit found that the district court should have allowed Rodriguez to amend his complaint as to those previously identified by code because the defendants "knew of their role in the search and were prepared to testify in the criminal trial; they also knew, or should have known the prisoner had commenced civil litigation to contest the validity of the [search]," and found that the prisoner made a "mistake" from his own perspective because "[h]e seems to have believed that use of the codes was essential to preserve the agents' undercover status (that's what "UC" means in the codes); the prosecutor in the criminal case may well have told him this."  *Id*. at *3.

The Seventh Circuit, however, distinguished a "Code Name" case from a "John Doe" case by recognizing that "[s]uing a particular person by a code name differs from suing "John Doe" or an equivalent placeholder," because "[s]uing a code name is in principle no different from suing any other name, which must be linked to a particular person by the time of judgment."  *Id*.

Here, like the plaintiff in *Herrera*, Johnson brought a § 1983 claim against the Officers by using a nominal placeholder—*Unknown Officers 1-5*—until he could ascertain their identities. ([Filing No. 1](#).)  Similar to the plaintiff in *Herrera*, after the statute of limitations ran, Johnson filed

an Amended Complaint to identify the Officers by name (Filing No. 43). Johnson argues *Herrera* was based on plaintiff's "lack of knowledge" as to the proper party, whereas here there was no such lack of knowledge, only an error in timeliness (Filing No. 67). The Court respectfully disagrees. When Johnson filed his initial Complaint, he identified the Officers as "*Unknown Officers 1-5*" and, therefore, lacked any knowledge regarding the Officers' identities.

Unlike the plaintiff in *Krupski* who had no idea she lacked knowledge of the proper defendant's identity, Johnson sued "*Unknown Officers 1-5*" fully aware that he lacked adequate information to ascertain the Officers' identities. (Filing No. 1.) Unlike the plaintiff in *Rodriguez* who identified the defendants by using the ATF officers under cover code name, Johnson identified the Officers by using a nominal placeholder—*Unknown Officers 1-5*—equivalent to suing a "John Doe" defendant. Johnson made a conscious choice to sue "*Unknown Officers 1-5*". Johnson did not make an inadvertent error. Johnson knew full well the differences between the nominal defendants—*Unknown Officers 1-5*—and the proper defendants. Such an intentional and informed decision does not amount to a "mistake" under Rule 15(c)(1)(C)(ii), and, as such, Johnson's § 1983 claim against the Officers cannot relate back to his timely filed Complaint.

Even considering the facts in the light most favorable to Johnson, the Court concludes Johnson's § 1983 claim against the Officers, is time barred.

### 2.   Relation Back Pursuant to Indiana Trial Rule 15(C)

Johnson also argues that Indiana Trial Rule 15(C) applies to allow relation back. However, Johnson's Amended Complaint was filed in federal court, so the Federal Rules of Civil Procedure are the applicable rules. *See Johnson v. Doe*, 2022 WL 954839, *4 (S.D. Ind. Mar. 30, 2022). Nevertheless, Johnson's reliance on Indiana Trial Rule 15(C) is likewise misplaced.

14

Indiana Trial Rule 15(C), like Federal Rule of Civil Procedure 15(c), provides that a belated amendment may relate back if, among other things, "the party to be brought in by amendment[ ] ... knew or should have known that but for a mistake concerning the identity of the proper party, the action would have been brought against [it]." *Miller v. Panther II Transportation, Inc.*, 2019 WL 1171235, *6 (S.D. Ind. Mar. 12, 2019). Indiana precedent, like Seventh Circuit precedent, does not provide Johnson with the favorable interpretation of "mistake" as set forth in *Krupski*. In *Miller v. Danz*, 36 N.E.3d 455 (Ind. 2015), an opinion issued after *Krupski*, the Indiana Supreme Court rejected the argument that the "lack of knowledge of [a defendant's] identity would qualify as a mistake for purposes of relation back under Trial Rule 15(C)." *Id*. at 457. As the court explained, "[a]dding a new party because there has been a mistake concerning the identity of the proper defendant, i.e., a misnomer, is not akin to inserting a name for a previously unknown 'John Doe' defendant." *Id*. at 458. Without a "'mistake,' Trial Rule 15(C) has no application." *Panther II Transportation, Inc.*, 2019 WL 1171235 at *6 (citing *Danz* 36 N.E.3d at 458). Johnson's § 1983 claim against the Officers, therefore, cannot relate back under Indiana Trial Rule 15(C) for the same reasons it does not relate back under Fed. R. Civ. P. 15(c).

### 3.   Relation Back Pursuant to Waiver and Estoppel

Alternatively, Johnson argues that, even if relation back does not apply under Rule 15(c) or Indiana Trial Rule 15(C), the Defendants waived or are estopped from raising the relation back argument because they substantially participated in this litigation and, therefore, were on notice of the § 1983 claim (Filing No. 67 at 19-21). The Court does not find Johnson's argument persuasive.

Johnson's cites five cases in support of his waiver and estoppel argument. *See LM Ins. Corp. v. ACEO, Inc.*, 08 C 2372, 2010 WL 1655206, at *1 (N.D. Ill. Apr. 16, 2010) (addressing a clerical error in the court's minute order); *Moore v. City of Harriman,* 272 F.3d 769, 771 (6th Cir.

2001) (reversing dismissal of § 1983 claims against previously named officers and holding the district court should have allowed plaintiff to amend his complaint to alter the capacity in which the officers were sued); *Cf. Architectural Metal Systems, Inc. v. Consolidated Systems, Inc.*, 58 F.3d 1227, 1231 (7th Cir.1995) (reversing summary judgment in a suit for breach of contract); *Packer Trading Co. v. CFTC*, 972 F.2d 144, 150 (7th Cir .1992) (reversing an award of reparations on the grounds of alter-ego theory and unclean hands doctrine); *Centex Construction v. James*, 374 F.2d 921, 923 (8th Cir.1967) (affirming the rescission of a subcontract for construction of certain sanitary and storm sewers due to a unilateral mistake during contract formation).

These cases are not controlling for a myriad of reasons but mainly because they do not address the "John Doe" issue at bar in this case.  The *City of Harriman* is not controlling because the officers there were named in the initial complaint and plaintiff was seeking to amend the complaint only to change the capacity in which they were sued.  272 F.3d 769.  None of the cited cases discussed Indiana Trial Rule 15(C).

To the extent Johnson alleges equitable tolling or equitable estoppel apply, the Court still must find in Defendants' favor.  The two equitable tolling doctrines, which "stop[s] the statute of limitations from running even if the accrual date has passed," are equitable tolling and equitable estoppel. *See Cada v. Baxter Healthcare Corporation*, 920 F.2d 446, 450-53 (7th Cir.1991). Equitable tolling applies only if (1) the plaintiff has diligently pursued the plaintiff's rights; and (2) some extraordinary circumstance nevertheless prevented timely filing.  *Mayberry v. Dittmann*, 904 F.3d 525, 529 (7th Cir. 2018). To satisfy the second requirement, the circumstances causing the litigant's delay must be "both extraordinary and beyond its control."  *Id*. (quoting *Menominee Indian Tribe of Wis. v. United States*, 136 S. Ct. 750, 756 (2016)). "[F]ailure to show either element will disqualify him from eligibility for tolling." *Id*. at 530. Equitable tolling is an "extraordinary

remedy that is rarely granted." *See Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) (quoting *Simms v. Acevedo*, 595 F.3d 774, 781 (7th Cir. 2010)); *Wallace v. Kato*, 549 U.S. 384, 396 (2007) ("Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs").

Equitable estoppel is called "fraudulent concealment" in the context of limitations of action. *Chapple v. National Starch & Chemical Company and Oil*, 178 F.3d 501, 506 (7th Cir.1999); *Cada*, 920 F.2d at 451. The doctrine is typically linked to a claim of fraudulent concealment, but the doctrine also applies to other conduct that lulls a party into inaction. *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 383 (Ind. 2019) (citing *Paramo v. Edwards*, 563 N.E.2d 595, 599 (Ind. 1990)). Here, neither equitable tolling nor estoppel would apply. With respect to equitable tolling, even if Johnson can show he diligently pursued his claim against the Officers, he has not alleged that an extraordinary circumstance prevented him from timely amending his Complaint but rather that he simply missed the deadline (Filing No. 67 at 17). Simply missing the filing deadline is not an extraordinary circumstance. With respect to equitable estoppel, Johnson has not alleged that Defendants, either by deception or by violating a duty, concealed any material facts to prevent him from learning the names of the Officers to timely amend his Complaint. In fact, Defendants' counsel provided Johnson's counsel with the names of the Officers long before the statute of limitations expired (Filing No. 58-10).

Under the circumstances here, the Court declines to exercise discretion to allow Johnson's § 1983 claim against the Officers to relate back to his initial Complaint. Because Johnson's § 1983 claim against the Officers is time barred and cannot proceed to trial, summary judgment in favor of the Defendants is granted.

C.      **Whether Johnson Can Establish a *Monell* Violation**

As another preliminary matter, Defendants argue Johnson's evidence in support of his

*Monell* claim against the City is inadmissible hearsay (Filing No. 71 at 6).  The Court agrees with

the Defendants.  Johnson's only evidence in support of his *Monell* claim against the City includes:

(1) eight newspaper articles covering reported incidents of excessive force by other IMPD officers

(Filing No. 67 at 21-22)[1]; and (2) the findings of an unattested study[2] completed in 2020 covering

"12,326 incidents of less-than-lethal force by law enforcement in Indianapolis (from 2014-2018)

and Wichita, Kansas (from 2008-2018)":

> Injuries to non-White persons are under-reported . . . and non-White persons are
> less likely to be referred for hospital evaluation after the use of force . . . . In
> Indianapolis, the presence of more than one officer significantly reduced the odds
> of hospitalization after both injury and serious injury . . . . For both cities, an
> estimated 25% more non-White persons who were subject to the use of force should
> have been evaluated in a hospital than actually were

*Id*. at 24.

1.      **Admissibility of Johnson's *Monell* Evidence**

With regard to the assessment of the evidence that is presented, the Seventh Circuit

has stated,

> Admissibility is the threshold question because a court may consider only
> admissible evidence in assessing a motion for summary judgment. *Haywood v.*

---

[1] "November 2018: IMPD shot a retired police officer in his home. *See* Ex. K [Dkt. 66-11]; February 2019: a woman died while being restrained by IMPD officers at church. *See* Ex. L [Dkt. 66-12]; Fall 2019: IMPD punched a high school student at Shortridge High School. *See* Ex. M [Dkt. 66-13]; August 2020: IMPD beat two women in broad daylight on Washington Street. *See* Ex. N [Dkt. 66-14]; Fall 2021: IMPD (like in this case) beat a handcuffed black man on the Circle. *See* Ex. O [Dkt. 66-15]; March 2022: in another case of excessive force against a handcuffed man an IMPD officer twisted a man's testicles while they had him handcuffed. *See* Ex. P [Dkt. 66-16]; April 2022: IMPD killed a pianist with a taser. *See* Ex. Q [Dkt. 66-17]; and IMPD has a long and well documented history of excessive force involving their police dogs. A detailed investigation by the *Indianapolis Star* revealed just how often IMPD was using this form of lethal force (K9) compared to other departments across the country and the results were alarming. *See* Ex. R [Dkt. 66-18]."

[2] *See,* Stuart Lewis and Bruce Bueno de Mesquita, Racial Differences in Hospital Evaluation After the Use of Force by Police: a Tale of Two Cities, J. RACIAL AND ETHNIC HEALTH DISPARITIES 7, 1178–87 (2020), https://doi.org/10.1007/s40615-020-00742-6.

> *Lucent Technologies, Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (inadmissible
> evidence will not overcome a motion for summary judgment). *See also Bombard v.*
> *Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996) (evidence relied
> upon at the summary judgment stage must be competent evidence of a type
> otherwise admissible at trial). A party may not rely upon inadmissible hearsay to
> oppose a motion for summary judgment. *See Logan v. Caterpillar, Inc.*, 246 F.3d
> 912, 925 (7th Cir. 2001) (inadmissible hearsay is not enough to preclude summary
> judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay
> is inadmissible in summary judgment proceedings to the same extent that it is
> inadmissible in a trial).

*Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009).

Newspaper articles and unattested documents are hearsay when offered to prove the truth

of their contents. *Wynn v. City of Indianapolis*, 2022 WL 1120490, *16 (S.D. Ind. Apr. 14, 2022)

(citing *Eisenstadt*, 113 F.3d at 742-43). However, the Seventh Circuit has recognized that

newspaper articles and other unattested hearsay documents may be used as evidence in opposition

to summary judgment if "some showing is made (or it is obvious) that they can be replaced by

proper evidence at trial," and it has not been feasible to obtain better evidence. *Eisenstadt*, 113

F.3d at 742-43 (concluding that a news article was not admissible under this principle because the

party offering it waived any argument that it was not feasible to depose the reporter to attest to the

article's contents). Alternatively, a newspaper article may be admissible at the summary judgment

stage "if it fit[s] into one of the exceptions permitting the use of hearsay evidence at trial." *Id*. at

743.

Here, to the extent Johnson relies on the newspaper articles and unattested study to prove

the truth of its content—*i.e.*, that the use of excessive force by IMPD officers employed by the

City is a custom or on the rise in Indianapolis, or that any of the incidents of excessive force

described in the newspaper articles and study occurred or occurred in the manner described—the

evidence is inadmissible hearsay. Johnson has not shown, or even argued, that it was not feasible

to obtain better evidence or that the newspaper articles and study can be replaced by admissible

evidence at trial ([Filing No. 67](#))[3]. Johnson does not address whether he could not obtain more probative, non-hearsay evidence about the incidents from Defendants during discovery in this case and, as such, has waived his ability to do so.  *Id*.  Notably, Johnson has not shown—or even argued—that a hearsay exception applies.  *Id*.

The Court therefore should not consider the newspaper articles or the study in analyzing the merits of Johnson's *Monell* claim against the City. Unfortunately, Johnson did not offer any other evidence in support of his *Monell* claim against the City.  But even if the Court were to conclude that the newspaper articles and unattested study are admissible, the Court would still find that Johnson has not put forth sufficient evidence creating a triable issue of fact to establish a viable *Monell* claim against the City.

### 2.      The Merits of Johnson's *Monell* Claim Against the City

For summary judgment purposes, and for purposes of considering Johnson's *Monell* claim, the City does not dispute that Johnson would be able to demonstrate that the Officers violated his rights secured by the Fourth and Fourteenth Amendments ([Filing No. 59 at 27](#)). Therefore, the Court is only tasked with determining whether Johnson has put forth sufficient evidence creating a triable issue of fact regarding his *Monell* claim against the City.

Johnson argues, "Defendant City of Indianapolis maintains customs or practices that support, or lack necessary policies or practices to counteract, racial profiling and discrimination." ([Filing No. 67 at 25](#).)  He further contends that deliberate indifference exists due to the City's failure to train the Officers after recognizing a pattern of constitutional violations, i.e., the use of excessive force and biased policing.  *Id*. at 23.  Defendants argue Johnson's *Monell* claim is baseless because the alleged constitutional violation was not caused by a governmental practice or

---

[3] The Court notes that several of the incidents alleging excessive force are pending cases in this district, and the truth of the matters has not yet been ascertained.

custom and, even if it were, the City did not act with deliberate indifference regarding a failure to train the Officers on the use of force or bias-free policing, and Johnson cannot show that City's policies were a moving force behind his constitutional deprivation (Filing No. 59). The Court agrees with the Defendants.

### i. The Standard for Establishing a *Monell* Violation

It is well-established law that under *Monell v. Department of Social Services*, a municipality or local government, like the City of Indianapolis, cannot be vicariously liable for the constitutional torts of its employees but only for the consequences of its own policies. *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) (citing *Monell*, 436 U.S. 658, 694 (1978)). This rule prevents municipalities from being held liable "'solely on the basis of the existence of an employer-employee relationship with a tortfeasor'" and stems from doubt that Congress intended to use the threat of liability "'to oblige municipalities to control the conduct of others.'" *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403 (1997) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 478–79 (1986)). There must be a "direct causal link between the municipal action and the deprivation of federal rights." *Id*. at 404.

For *Monell* liability to attach, Johnson must satisfy three elements. First, he must trace the constitutional violation to some municipal action: (1) an express policy, (2) a widespread practice or custom, or (3) action by one with final policymaking authority. *Stockton v. Milwaukee County*, 44 F.4th 605, 617 (7th Cir. 2022). Second, Johnson must show the municipal action amounts to deliberate indifference, a high hurdle to clear. *Id*. Third and finally, Johnson must provide evidence that the municipal action was the "moving force" behind the constitutional injury, a "rigorous" causation standard demanding a "direct causal link between the challenged municipal action and the violation of the constitutional rights." *Id*. Here, Johnson proceeds under the

widespread practice or custom scheme, arguing the City is liable for its failure to adequately train the Officers regarding the use of force and bias-free policing or that they failed to require additional training after a pattern of constitutional violations.

Even accepting that Johnson may be able to satisfy his initial burden by establishing a widespread practice or custom, the Court is not convinced that he has put forth evidence creating a triable issue of fact as to the second *Monell* factor—deliberate indifference—or the third *Monell* factor—the "moving force" causal link.

ii.    **The Deliberate Indifference Factor**

The Supreme Court in *City of Canton, Ohio v. Harris* observed that the deliberate indifference standard is met where, "in light of the duties assigned to specific officer or employees[,] the need for more or different training is ... obvious," and the existing inadequacy is "likely to result in the violation of constitutional rights."  489 U.S. 378, 389 (1989).  Only where a municipality's failure to train its employees evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983.  *Wordlow v. Chicago Bd. Of Ed.*, 2018 WL 6171792, *15 (N.D. Ill. Nov. 26, 2018) (citing *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997)).

A municipality can therefore demonstrate a deliberate indifference to the constitutional rights of its citizens in two ways: (1) when the municipality "fails to train its employees to handle a recurring situation that presents an obvious potential for a constitutional violation and this failure to train results in a constitutional violation"; or (2) when the municipality "fails to provide further training after learning of a pattern of constitutional violations."  *Dunn v. City of Elgin*, 347 F.3d 641, 646 (7th Cir. 2003).  Under either scenario, "the finding of 'deliberate indifference' is derived from the City's failure to act in the face of 'actual or constructive notice' that such a failure is likely

to result in constitutional deprivations." *Robles*, 113 F.3d at 745. Here, Johnson puts forth eight newspaper articles to prove that IMPD failed to train its officers or that they failed to provide further training after learning of a pattern of constitutional violations ([Filing No. 66-11](#); [Filing No. 66-12](#); [Filing No. 66-13](#); [Filing No. 66-14](#); [Filing No. 66-15](#); [Filing No. 66-16](#); [Filing No. 66-17](#); [Filing No. 66-18](#)). However, this evidence fails to create a triable issue of facts regarding whether the City acted with deliberate indifference.

Johnson has offered no evidence that IMPD failed to train its Officers on the use of force or bias-free policing. The Officers received substantial training as recruit officers and in the field ([Filing No. 58-11 at 2-4](#), 7-45). Recruit officers are required to complete six months of training at the Academy where they learn about IMPD's directives, receive about 60 hours of de-escalation training, receive approximately 60 hours of training regarding search and seizure, complete hundreds of hours of training regarding the use of force, and complete an 8-hour course called "fair and impartial policing." *Id*. at 2. After graduating from the Academy, the officers are placed on a one-year probation period and must complete the IMPD Field Training Officer program, and, upon completion of the program, the Chief of Police determines whether to retain or terminate the officer. *Id*. at 3. Defendants' records show—and Johnson does not dispute—that the Officers were current with all IMPD and state-required training, including training on the use of force and bias-free policing. *Id*. at 2-4, 7-45.

Based on the evidence, there was no pattern of constitutional violations by IMPD officers and, therefore, the need for more or different training was not obvious to the City. The designated evidence shows that an annual analysis of reports covering incidents of use of force was conducted in an effort to reveal patterns or trends ([Filing No. 58-12 at 16-17](#)). Defendants' evidence shows that "[o]ut of nearly 7,000 uses of force documented by IMPD officers over the past five years,

there were eleven incidents where IMPD determined that officers used unreasonable force." *Id.* Based on this information, IMPD did not believe—and this Court agrees—that there was no pattern of constitutional violations by IMPD officers regarding the use of force. *Id.* at 17-18.  If a pattern existed, the Professional Standards Branch would have notified the Training Division Commander or the Commander's designee and the Performance and Policy Division and advised whether additional training was needed, equipment upgrades required, or policy modifications necessary. *Id.* 9.

Even if Johnson could establish a pattern of constitutional violations, he has not shown that the City failed to require additional training by IMPD officers. Once retained as an officer, IMPD requires its officers to complete, at minimum, sixteen hours of in-service training on firearms and the use of force each year (Filing No. 58-11 at 4). IMPD maintains policies on bias-free policing, requires its officers to complete annual training, and maintains a procedure for reporting incidents of alleged bias or discrimination (Filing No. 58-12 at 9-10). IMPD also maintains a procedure for reporting incidents of alleged bias or discrimination, and officers are subject to discipline if they are found to have violated the bias-free policing policy. *Id.* at 11.

Johnson has not put forth evidence to create a triable issue of fact to show the City acted with deliberate indifference by failing to train the Officers regarding the use of force and bias-free policing or by failing to require additional training after a pattern of constitutional violations occurred.

**3.      The Moving Force Factor**

Even if the Court were to find that Johnson can show the City acted with deliberate indifference, he has not put forth evidence to create a triable issue of fact that the City's policies or customs were the "moving force" behind his alleged constitutional deprivation.

24

It is not enough to show that a widespread practice or custom was a factor in the constitutional violation; it must have been the moving force. *Estate of Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007).  The moving force factor does not require that a policy or practice be the moving force behind a plaintiff's physical injury, but only that the policy be the moving force behind "the constitutional violation." *City of Canton*, 489 U.S. at 389.  The Seventh Circuit has opined that a "moving force" is the "catalyst" for the injury in question, not merely a "contributing factor". *Johnson v. Cook Cty.*, 526 F. App'x 692, 696 (7th Cir. 2013); *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 307 (7th Cir. 2010) (training or policy changes that "might" have had an effect on plaintiff's treatment did not satisfy causation requirement).

Here, Johnson puts forth only the newspaper articles and a peer-reviewed study to support his argument that the City's policies or customs or lack thereof on the use of force and bias-free policing was the moving force behind his constitutional deprivation.  (Filing No. 67.)  The newspaper articles highlight eight instances where IMPD officers allegedly used unreasonable force (Filing No. 66-11; Filing No. 66-12; Filing No. 66-13; Filing No. 66-14; Filing No. 66-15; Filing No. 66-16; Filing No. 66-17; Filing No. 66-18).  The study considered "12,326 incidents of less-than-lethal force by law enforcement in Indianapolis (from 2014-2018) and Wichita, Kansas (from 2008-2018)" and concluded that, "[f]or both cities, an estimated 25% more non-White persons who were subject to the use of force should have been evaluated in a hospital than actually were." (Filing No. 66-19 at 1.)

For their part, the Defendants have designated IMPD's General Order Directives; Use of Force Principles,  Investigation and Reporting policies; Bias-Free Policing policies and directives; and Rules and Regulations. (Filing No. 58-12 at 19-77). As previously discussed on pages 22-23 of this decision, the Officers received substantial training as recruit officers and while in the field.

(Filing No. 58-11 at 2-4, 7-45.)    The Use of Force Policy requires officers to offer medical assistance to "any person who, as a result of an officer's use of force, has sustained visible injury or serious bodily injury, or who has expressed a complaint of injury or continuing pain."  (Filing No. 58-12 at 5.)  Defendants' records show that, after leaving the Academy, all three Officers were continually trained regarding the use of force and bias-free policing and—Johnson does not dispute—that the Officers were current with all IMPD and state-required training at the time of the incident (Filing No. 58-11 at 2-4, 7-45; Filing No. 67).  The evidence does not show that the City policies or customs were the moving force behind Johnson's alleged constitutional violation. To the contrary, the moving force was not a failure to train or require additional training but possibly the Officers' failure to heed their training.

Furthermore, Johnson has not alleged (1) that the Officers were the subject of prior discrimination or use of excessive force complaints and, therefore, if the City had taken steps to investigate the Officers, it would have found a pattern and removed them from the force; (2) that the Officers knew Johnson's race when they responded to the burglary complaint or entered the garage; or (3) that they based their detention strategy on account of his race.  (Filing No. 67.)  If the Court were to agree with Johnson's contentions, anytime an IMPD officer were alleged to have used excessive force against a person of color or failed to offer medical assistance after an incident, it would create an automatic ground for a constitutional violation claim.

There is not a triable issue of fact regarding the City's policies or customs or lack thereof regarding the use of force or bias-free policing because there is no causal connection between the City's policies and customs and Johnson's alleged constitutional deprivation.

## D.    Whether the Court Should Exercise Supplemental Jurisdiction

Lastly, Defendants argue the Court should not exercise supplemental jurisdiction over Johnson's state law claim against all Defendants pursuant to Article 1, § 11 of the Indiana Constitution (Filing No. 43 at 5-6).  Because the state law claim was joined with his federal claim—the § 1983 claim and the *Monell* claim—the Court exercised supplemental jurisdiction over them pursuant to 28 U.S.C. § 1367.  Now that the § 1983 claim and the *Monell* claim are being dismissed, the Court must determine whether it is appropriate to continue exercising supplemental jurisdiction over Johnson's state law claim against Defendants.

The Court has discretion whether to exercise supplemental jurisdiction over a plaintiff's state law claim.  *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009); *see* 28 U.S.C. § 1367(c) ("The district courts may decline to exercise supplemental jurisdiction over a claim ... if ... the district court has dismissed all claims over which it has original jurisdiction ....").  When deciding whether to exercise supplemental jurisdiction, "'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity.'"  *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)).

"Normally, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state law claims rather than resolving them on the merits."  *Sharp Elecs. v. Metro. Life Ins.*, 578 F.3d 505, 514 (7th Cir. 2009) (citation and quotation marks omitted).  Exceptions to this general rule exist: "(1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claim can be decided." *Davis v. Cook Cnty.*, 534 F.3d 650, 654 (7th Cir. 2008) (internal quotation omitted).

Here, all federal claims against the Defendants have been dismissed, and Johnson failed to respond to Defendants' supplemental jurisdiction argument or argue that an exception applies. Substantial judicial resources have not been expended on the claim and it is not clear how the pendent claim will be decided. Under these circumstances, the pendent state-law claim (which will be based on the interpretation of Indiana constitutional law) should be decided in state court. The Court finds it is in the best interest of judicial economy to decline to exercise supplemental jurisdiction over the remaining state law claim against the Defendants.

## IV.   CONCLUSION

For the reasons stated above, the Defendants' Motion for Summary Judgment (Filing No. 57) is **GRANTED** as to Count 1: Unconstitutional Use of Excessive Force; and Count 3: *Monell* Violations of the U.S. Constitution. Summary judgment is entered in favor of Officers Kinder, Forsyth, and Reeves on the § 1983 claim and in favor of the City of Indianapolis on the *Monell* claim.  The Court declines to exercise supplemental jurisdiction over the remaining state law claim, Count 2: Violation of Indiana Constitution. That claim is **DISMISSED without prejudice** so that Johnson can pursue it in state court if he so desires.

**SO ORDERED.**

Date:   _11/30/2022_

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Annemarie Alonso
SAEED & LITTLE LLP
annie@sllawfirm.com

Gabrielle Emilia Olshemski
SAEED & LITTLE LLP
gaby@sllawfirm.com

Jessica A. Wegg
SAEED & LITTLE LLP
jessica@sllawfirm.com

Jonathan Charles Little
SAEED & LITTLE LLP
jon@sllawfirm.com

Anthony W. Overholt
FROST BROWN TODD LLC (Indianapolis)
aoverholt@fbtlaw.com

Brandon E. Beeler
CITY OF INDIANAPOLIS OFFICE OF CORPORATION COUNSEL
brandon.beeler@indy.gov

Kiely C Keesler
CITY OF INDIANAPOLIS OFFICE OF CORPORATION COUNSEL
kiely.keesler@indy.gov

Mathew Rayman
OFFICE OF CORPORATION COUNSEL
mathew.rayman2@indy.gov